```
KAREN A. OVERSTREET
Chief Bankruptcy Judge
United States Courthouse
700 Stewart St., Suite 6310
Seattle, WA  98101
206-370-5330
```

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re | ) |
| | ) Chapter 7 |
| KENNETH ADAM BELL, | ) |
| | ) |
| Debtor. | ) |
| | ) Bankruptcy No. 09-13655 |
| _____ | ) |
| | ) |
| BANNER BANK, | ) Adversary No. 09-01311 |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) **MEMORANDUM DECISION** |
| | ) |
| KENNETH ADAM BELL, | ) |
| | ) **NOT FOR PUBLICATION** |
| | ) |
| Defendant. | ) |
| _____ | ) |

This matter came before me for trial on June 29, 2010. After hearing the evidence and oral argument I took the matter under advisement so that I could review more carefully the exhibits admitted at trial. This Memorandum Decision contains my findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052. I have jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).[1]

---

[1] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et*

MEMORANDUM DECISION - 1

For the following reasons, I find that the defendant, Kenneth Bell, is entitled judgment and dismissal of all of plaintiff's claims.

## I. BACKGROUND

This is an action by plaintiff, Banner Bank ("Banner" or the "Bank"), to except from discharge a debt alleged to be approximately $205,000 on the ground that it is nondischargeable under Sections 523(a)(2)(B)(use of a fraudulent written statement), 523(a)(4)(defalcation while acting in a fiduciary capacity), and 523(a)(6)(malicious injury).

## II. FINDINGS OF FACT[2]

**A. Defendant's Businesses.**

The defendant's corporations, Realty Executives, Professionals, LLC ("Professionals") and RE Exec PNW, LLC ("PNW") transacted business with Banner in 2001 and 2005, respectively. Mr. Bell formed Professionals in 2001 as a real estate brokerage with a single office and as a franchisee of Realty Executive International ("REI"). In 2002, Professionals moved into a larger office at 12207 8th Ave. N.E. in Bellevue, Washington ("8th Ave."). Professionals opened a second office in 2004 located at 2370 130th N.E. in Bellevue, Washington ("Bridal Trails"). Banner provided an initial line of credit to Professionals for operating capital, furniture and equipment, and other general purposes. Banner provided additional financing to assist Professionals when it moved

---

*seq.*

[2] The admitted facts in the parties' pretrial order at Docket No. 12 are incorporated herein by this reference.

MEMORANDUM DECISION - 2

to the 8th Ave. office and then in connection with its expansion to the Bridal Trails office.

In 2004, Mr. Bell had an opportunity to purchase master franchise agreement rights and to become a regional franchisor for REI. Bell formed PNW to operate that franchise business. The Bank provided PNW with part of the funds necessary to acquire the master franchise rights under the Sub-Franchise Agreement with REI, which was executed by Mr. Bell in December 2004. Ex. 16. Pursuant to that agreement, PNW was required to pay an initial franchise fee of $193,550 in the form of a promissory note requiring a minimum annual payment of accrued interest and payments of principal from fees collected by PNW from its franchisees. By its terms, the note was due and payable 10 years from the date of its execution. Ex. 16. Pursuant to the terms of the Sub-Franchise Agreement, PNW was authorized to use the REI name and real estate referral system in both Washington and Oregon and to license franchisees in the same states.

Both Professionals and PNW enjoyed financial success until 2007, when the real estate market began to collapse. In late 2007, it became apparent that Professionals could not maintain two offices so it closed the 8th Ave. office and consolidated its business in the Bridal Trails office. Because Professionals was still obligated on the lease at 8th Ave., it sought out a sublessor, Brio Realty, Inc. ("Brio"), which took over the office and the Professionals furniture and equipment located there.

Both Brio and Professionals continued to struggle financially so in August of 2008, they decided to merge into a new entity, Brio Professionals, LLC, dba Realty Executives Brio ("Brio LLC"). After

MEMORANDUM DECISION - 3

the merger, Brio LLC moved its agents into the Bridal Trails office and the 8th Ave. office was abandoned.  Mr. Bell liquidated the remaining office furniture and equipment at 8th Ave. through Craigslist and obtained a few thousand dollars in proceeds.

On February 27, 2009, Banner filed a lawsuit against the Mr. Bell in state court after the loans went into default. Mr. Bell filed a chapter 7 bankruptcy proceeding on April 16, 2009.

**B.   The Banner Bank Loans.**

The lending relationship between Banner and Professionals and PNW extended from 2001 through 2008.  The loans that are at issue in this proceeding are described below.

On May 16, 2007, Professionals obtained a loan from Banner in the principal amount of $121,000 (Loan #2643).  Ex. 1.  This loan was a renewal of an earlier loan.  Exhibit 1, the promissory note evidencing this loan states that the maturity date of the loan is May 25, 2010.  Also on May 16, 2007, Professionals obtained a $50,000 loan from Banner (Loan #0464).  Ex. 2.  This loan, which was also a renewal of an earlier loan, had a maturity date of May 10, 2008.  Ex. 2.

On November 29, 2005, PNW obtained a loan from Banner in the principal amount of $46,131.72 (Loan #9103).  Ex. 6.  The promissory note evidencing this loan states that the loan is unsecured.  Ex. 6, p. 2.  The promissory note further states that this loan would mature on December 10, 2008.  On December 2, 2008, PNW obtained a loan in the amount of $39,614.43 (Loan #1791), which was also a renewal of an earlier loan.  Ex. 7.  By the terms of the note, it was to mature on November 15, 2009.

MEMORANDUM DECISION - 4

Loan #0464 was secured by a security interest in all accounts, equipment, and general intangibles of Professionals. Ex. 4. It is not clear whether Exhibit 4, a Commercial Security Agreement dated August 7, 2001, also secures Loan #2643. Exhibit 4 states that it secures a note dated August 7, 2001 in the principal amount of $35,000 and any renewals or extensions of that note. In any case, when Loan #2643 was renewed on December 8, 2008, as described below, Mr. Bell granted the Bank a lien against his personal residence to secure this loan. Loan #1791 was secured by a security interest in all inventory, chattel paper, accounts, equipment and general intangibles of PNW. Ex. 9. Each of the security agreements forbid the removal or sale of the collateral without the Bank's consent.

Mr. Bell personally guaranteed payment and performance of the obligations of Professionals to the Bank, Ex. 3, and the obligations of PNW to the Bank, Ex. 8. Mr. Bell was the owner of each of the entities and had access to, and control of, all of the assets of these entities.

On December 2, 2008, PNW's Loan #9103 was renegotiated and renewed in the reduced principal balance of $5,388.97, and the maturity date extended to March 10, 2009. Ex. 19. This loan remained unsecured. Mr. Bell testified that the reduction in the principal balance was due to the payments made since the execution of the prior note in November of 2005. It does not appear that PNW's Loan #1791 was ever renegotiated, probably because it was not due to mature until November 15, 2009.

On December 8, 2008, Professionals executed a replacement promissory note in favor the Bank for Loan #2643. The principal

MEMORANDUM DECISION - 5

balance of the note was reduced to $85,564.02, but the maturity date was accelerated to May 15, 2009, from the maturity date of May 25, 2010 in the May 2007 promissory note (Ex. 1). Ex. 21. The promissory note recites that the Bank received additional collateral for this loan in the form of a third deed of trust (the "3rd DOT") against Mr. Bell's personal residence. Similarly, on the same day, Professionals' Loan #0464 was renegotiated and renewed in the principal amount of $48,986.71, with a maturity date of May 15, 2009, and with additional collateral pledged in the form of the 3rd DOT. Ex. 20.

Mr. James Sleighter, the bank officer assigned to manage the loans of Professionals and PNW, testified that he had a cordial and cooperative relationship with Mr. Bell, that they frequently spoke by telephone and met personally in the bank's branch about the status of Mr. Bell's businesses and the loans. Mr. Bell's testimony was consistent, and in addition, he testified that he felt the Bank was always very supportive of his business efforts.

From the inception of the relationship, the Bank requested at least annually copies of the companies' financial statements and periodically also requested updated financial information each time a new loan was made or an existing loan modified. Exhibit 10 contains a collection of financial information given to the Bank by Mr. Bell and upon which the Bank relied, per the testimony of Mr. Sleighter, in making and renewing the loans. The financial statements in Exhibit 10 present consolidated balance sheet and income information for both Professionals and PNW. The statements do not break out the assets by office location. Mr. Sleighter testified that he understood the financial statements he received

MEMORANDUM DECISION - 6

from Mr. Bell showed assets on the balance sheet at their purchase price reduced for depreciation, usually on an annual basis. He also understood that accounts receivable shown on the balance sheet represented desk fees payable by real estate agents working for the companies or a franchisee of PNW, which fees would be payable only if sales of real estate attributable to those agents actually closed.

Mr. Bell testified that Mr. Sleighter was well aware of the financial stresses of Mr. Bell's company in 2007 and 2008 when the real estate market began to collapse. Mr. Sleighter testified that the Bank was attempting to work with Mr. Bell during this difficult period. He agreed that by 2007, it was no longer financially feasible for Mr. Bell to maintain the 8th Ave. office and he understood that the business would be moved from that location and consolidated into the Bridal Trails office. Mr. Sleighter was aware that Mr. Bell was attempting to sublease the 8th Ave. office to cut down on the expense of that lease.

Mr Sleighter testified that in 2008 the Bank was attempting to restructure Professionals' loans, which he testified were past due. There is no evidence, however, of any notice of default on either Loan #2643, which did not mature until May 25, 2010, or Loan #0464, which would have matured on May 10, 2008. Both loans were renegotiated in December 2008 as indicated above. The Bank, concerned about its collateral coverage, asked for and received the 3rd DOT as additional collateral for these loans.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Court makes the following conclusions of law.

MEMORANDUM DECISION - 7

The plaintiff has the burden of proving each element of Section 523 by a preponderance of the evidence. *Grogan v. Garner*, 298 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are to be construed strictly against the objecting creditor and liberally in favor of debtor. *In re Linn*, 38 B.R. 762 (Bankr. 9th Cir. 1984).

**A. Section 523(a)(2) - Fraud.**

To prove fraud under Section 523(a)(2)(B), plaintiff must prove the following elements: (1) use of statement in writing, (2) that is materially false, (3) respecting the debtor's or an insider's financial condition, (4) on which the creditor to whom the debtor is liable for such money, property, services, or credit <u>reasonably</u> relied; and (5) that the debtor caused to be made or published with intent to deceive. Importantly, however, if the creditor does not advance new money at the time of the misrepresentation, but renews or extends the debt, it must demonstrate that "it had valuable collection remedies at the time of the extension or renewal, that it did not exercise in reliance on the debtor's misrepresentation and that those remedies lost value during the extension or renewal period...." in order to meet the proximate cause element. *In re Kim*, 163 B.R. 157 (9th Cir. BAP 1994), *aff'd* 62 F.3d 1511 (9th Cir. 1995).

The substance of the Bank's claim is that in November of 2008, when the loans were renegotiated and renewed, Mr. Bell presented financial statements to the Bank which misrepresented that Professionals had accounts receivables of $68,050.22, a phone system worth $31,028.13, office equipment worth $148,143.09, and computer equipment of $39,748.99. The Bank also relies on an email

MEMORANDUM DECISION - 8

sent by Mr. Bell on October 23, 2008, in which he stated that the "value in Master Franchise is Several Hundred Thousand more than I owe" and that the value of Professionals was approximately $10,000 per licensed agent, with the number of licensed agents being 87. Ex. 12.

In late 2008, however, only three of the Bank's loans were renegotiated, Loans #2643, #0464 and #9103. I find no evidence that Loan #1791, Ex. 7, which was secured by the REI franchise rights, was renewed or extended. That loan was not set to mature until November 15, 2009, and there is no evidence that the Bank had accelerated the loan on account of any default. Also, Loan 2643, the largest loan owed by Professionals, and which was secured by the furniture and equipment purchased for the Bridal Trails office, was rewritten, but no new funds were advanced and rather than extending the loan, the Bank moved up the maturity date on the loan from May 2010 to May 2009. The Bank did not prove that it gave up any valuable collection remedies at the time the loan was rewritten and it in fact added collateral for the loan in the form of the 3rd DOT. Loan #9103, which was extended in December 2008, was unsecured and the Bank failed to demonstrate that it had any valuable collection rights which it gave up at the time of the extension. Thus, as to these loans, I conclude that the Bank has failed to prove that any misrepresentation by Mr. Bell, assuming there was one, was the proximate cause of its loss.

At the end of 2008, the maturity date of Loan #0464 was extended from May 2008 to May 2009. In connection with the renegotiation, the Bank also obtained the 3rd DOT to secure this loan. There is no evidence, however, that had the Bank exercised

MEMORANDUM DECISION - 9

its collection rights in late 2008 against collateral securing this loan it would have avoided the loss it now claims. Mr. Sleighter acknowledged that he knew that the personal property asset values in the financial statements presented to him were based upon book value rather than actual fair market value. In addition, the balance sheets in Exhibit 10 show that the equipment had been substantially depreciated. Mr. Bell testified that the most valuable pieces of personal property are still in the Bridal Trails office subject to the Bank's lien. Mr. Sleighter knew that the accounts receivable were collectible only if the agents were able to close sales of real property. The Bank provided no evidence of what it could have collected had it exercised its remedies against accounts receivable at the end of 2008. Finally, the Franchise Agreement by its terms was not assignable without the consent of the franchisor, REI, and it did not secure Loan #0464 in any case. Because the Bank failed to prove that it lost valuable collection rights by extending Loan #0464 for a one year period beyond its maturity date, that loan cannot be the basis for a fraud claim under Section 523(a)(2).

Thus, as to each of the loans, I conclude that the Bank has failed to meet its burden on the proximate cause element of Section 523(a)(2).

**B.  Section 523(a)(4)(Breach of Fiduciary Duty).**

To prove fraud or defalcation while acting in a fiduciary capacity, a plaintiff must show that the defendant was a fiduciary to whom funds were entrusted. The meaning of "fiduciary" under Section 523(a)(4) is an issue of federal law. "Section 523(a)(4) excludes constructive, resulting or implied trusts. A fiduciary

MEMORANDUM DECISION - 10

relationship for purposes of § 523(a)(4) exists only where there is an express or statutory trust. *In re Aubrey*, 111 B.R. 268, 275 (9th Cir. BAP 1990); *see also In re Pedrazzini*, 644 F.2d 756, 758 n. 2(9th Cir. 1981)." *In re Martin*, 161 B.R. 672, 676 (9th Cir. BAP 1993). Courts must look to state law to determine whether the requisite trust relationship exists. "The statute must define the trust res, spell out the trustee's fiduciary duties and impose a trust prior to and without reference to the wrong which created the debt." *In re Baird*, 114 B.R. 198, 202 (9th Cir. BAP 1990). Typically, the relationship between a guarantor and a creditor does not create the requisite trust relationship. There was no evidence presented of any special trust or fiduciary relationship between the Mr. Bell and the Bank that would support relief under Section 523(a)(4).

**C. Section 523(a)(6)(Malicious Injury).**

Proof of a cause of action under Section 523(a)(6) requires a two step process. First, plaintiff must prove that Mr. Bell committed a "willful" injury. *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 831 (9th Cir. BAP 2006). To satisfy the willfulness element, a creditor must prove that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended not just to commit the act itself, but also intended the consequences of the act. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Further, the Court must apply a subjective test in determining the debtor's intent. "[Section] 523(a)(6) renders a debt nondischargeable when there is either a subjective intent to harm, or a subjective belief that harm is substantially

MEMORANDUM DECISION - 11

certain." *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1144 (9th Cir. 2002).

The second step in the Section 523(a)(6) analysis is to determine whether the debtor's conduct was "malicious." *Kaligh*, 338 B.R. at 831. In order to be found malicious, the debtor must have committed a (1) wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) which is done without just cause or excuse. *Id*. The last element, whether the act was done without just cause or excuse, presents a mixed question of law and fact. *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1105-06 (9th Cir. 2005), *cert. denied* 125 S.Ct. 2964 (2005). Evidence of specific intent to injure can negate just cause or excuse. *Khaligh*, 338 B.R. at 831.

Unlawful conversion of another's property may constitute a willful and malicious injury. To prove conversion, the creditor must prove that when the debtor converted the creditor's property, he had the specific intent to deprive the creditor of the property or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. *Spokane Ry. Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471 (Bankr. D. Id. 2000). The creditor is entitled only to damages in the amount of the value of the property converted.

Plaintiff must prove some affirmative action by Mr. Bell intended to injure plaintiff. For example, in the case of *In re Foust*, 52 F.3d 766 (8th Cir. 1995), the court upheld the denial of the debtor's discharge under Section 523(a)(6) where the debtor had secretly converted crops which secured a government loan by selling the crops to distant grain elevators and placing the proceeds of

MEMORANDUM DECISION - 12

the sales in his personal accounts.  The debtor then fabricated reports of grain thefts to cover up his scheme.  *See also Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480 (5th Cir. 1986)(discharge of corporate president denied under Section 523(a)(6) where he took proceeds of inventory sales to Las Vegas in hope of winning enough money to save dealership).

No such malicious conduct has been proved in this case. Mr. Bell testified that when Professionals abandoned and sublet its 8th Ave. office to Brio in 2007, it transferred what office furniture and equipment it had left in that office to Brio for $2,000 and Brio's agreement to make Professionals' lease payments. Mr. Bell testified that he discussed the arrangement with Mr. Sleighter and advised him that the only alternative would be to put the furniture and equipment in storage as it was not needed at the Bridal Trails office and most of it was old and not worth much. Mr. Sleighter disputed that he had discussed Mr. Bell's plan to transfer the assets to Brio, but he admitted that he was aware that Brio was going to take over the space and pay Professionals' lease payments.  When Brio vacated the 8th Ave. office in September 2008, Mr. Bell listed and sold the remaining furniture and equipment at that location on Craigslist for a total of $4,191, which he then used to invest in the new Brio LLC entity.  *See* Ex. 13, 14, 15.  At the time Mr. Bell sold these assets, he testified that he believed they were owned by Brio and not subject to the Bank's security interest.  He also testified that he believed the only way the Bank could be repaid given the poor real estate market was if Brio and his companies joined forces.

MEMORANDUM DECISION - 13

Charles Johnson, attorney for Professionals, confirmed what happened to the 8th Ave. office furniture and equipment in a letter dated May 2009, to counsel for the Bank. Ex. 14. In that letter, Mr. Johnson reiterated that all of the office furniture and equipment financed by the Bank for the Bridal Trails office was still in that office, had not been sold, and was being used by Brio LLC.

The evidence shows that whatever furniture and equipment remained at the 8th Ave. office was not of significant value. Professionals, given its financial problems, could not continue to maintain that office. Mr. Bell was trying to manage the problem of finding a subtenant for the space and getting all of the furniture and equipment out of the space when the landlord demanded removal at the end of 2008. Mr. Sleighter was aware at that time that Mr. Bell's companies were working with Brio LLC and that the 8th Ave. office was being vacated. Yet, the Bank took no action to even examine or inventory its collateral in that location. There is no evidence of the kind of intentional, malicious conduct by Mr. Bell in his actions that would warrant excepting from discharge his liability to the Bank under Section 523(a)(6).

**D. Collateral Held by Brio LLC.**

There is no dispute that the most valuable furniture and equipment assets of Professionals and PNW are currently in use in the Bridal Trails office. Any merger between those entities and Brio, to the extent there is a lawful merger, would not void the lien of the Bank in those assets and there is nothing preventing the Bank from seizing that collateral and liquidating it. In addition, any interest of Mr. Bell in Brio LLC would be property of

MEMORANDUM DECISION - 14

the estate subject to liquidation by the trustee in the main case for the benefit of creditors.

**CONCLUSION**

For the foregoing reasons, I will enter an order granting judgment in favor the defendant, and dismissing all claims against him, upon presentation by the defendant's counsel.

//End of Memorandum//

*Karen A. Overstreet*
United States Bankruptcy Judge
(Dated as of Entered on Docket date above)

MEMORANDUM DECISION - 15